FILED

December 23, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time: 1:24 PM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | |
|---|---|
| Jeremiah Roper,<br>　　　　Employee,<br><br>v.<br><br>Allegis Group,<br>　　　　Employer,<br>and<br>Agri General Insurance Company,<br>　　　　Insurance Company. | Docket No.:　2016-01-0546<br><br>State File No.: 61298-2016<br><br>Judge: Audrey A. Headrick |

## EXPEDITED HEARING ORDER
## GRANTING TEMPORARY DISABILITY AND MEDICAL BENEFITS

This matter came before the Court on December 13 2016, on a Request for Expedited Hearing filed by Jeremiah Roper.  The central legal issue is whether Allegis Group has adequate grounds to deny Mr. Roper's claim based on the affirmative defense of willful failure or refusal to use a safety device.  For the reasons set forth below, the Court holds Allegis failed to present sufficient evidence demonstrating it is likely to prevail at a hearing on the merits that Mr. Roper willfully failed or refused to use a safety device.  Accordingly, based upon the evidence presented at this time, the Court concludes Mr. Roper is likely to prevail at a Compensation Hearing that his August 11, 2016 injury is compensable.[1]

### History of the Claim

Although the parties dispute whether Mr. Roper violated any safety rules, the facts in this matter are relatively undisputed.  Mr. Roper is a thirty-six-year-old high school graduate.  He works for Allegis, a temporary agency, which placed him at Waupaca Foundry, an iron foundry, in January or February 2016 as a sand mechanical maintenance employee.[2]  In his third-shift position, Mr. Roper was responsible for performing

---

[1] A complete listing of the technical record and exhibits is attached to this Order as an appendix.

[2] All pleadings properly identify Allegis Group as the employer.  However, counsel for both sides repeatedly referred to "Aerotek" as Mr. Roper's employer.  The record is silent on this issue, but the Court infers that Aerotek

1

maintenance on conveyors, dust collection systems, air filtrations systems, and auger systems.[3] For each shift, one to two maintenance employees work on the auger system.

The parties agreed that Mr. Roper was familiar with the "lock-out/tag-out" process prior to working at Waupaca based upon his past employment history of dealing with mechanical issues. Lock-out/tag-out refers to the process of de-energizing, or turning off, all power supply sources to a machine. The purpose of the lock-out/tag-out process is to avoid injuries during the performance of maintenance.

The parties also agreed that Mr. Roper received safety training after he started working at Waupaca. He received training on Waupaca's policies, procedures and rules during his first week there, including training on Waupaca's "Energy Control and Lockout Compliance Work Instruction." (Ex. 3.) The handbook states in 1.3 that, "[e]quipment will be locked out before employees perform any servicing or maintenance where the unexpected energization or start-up of the machine or equipment or release of stored energy could cause injury to employees." *Id.* It defines "servicing" or "maintenance" in 2.11 as follows: "Workplace activities such as constructing, installing, setting up, adjusting, inspecting, modifying, and maintaining and/or servicing machines or equipment. These activities include but are not limited to lubrication, cleaning or unjamming of machines." *Id.*

Waupaca's handbook also addresses "troubleshooting." In section 2.12, it states troubleshooting is the "[s]ystematic approach to locating the cause of a fault in an electronic circuit or system." *Id.* The handbook provides an in-depth discussion regarding troubleshooting. For authorized maintenance employees performing troubleshooting, it states in 8.1.1: "[w]hen conducting troubleshooting activity where energy sources must remain on to perform the task, extreme care shall be exercised to avoid placing the body into a hazardous zone." *Id.* The handbook goes on to state in 8.1.2:

> Authorized Maintenance Employees involved in trouble shooting must maintain a safe distance. They must not approach closer than necessary, and in no case, closer than 6 inches to the point of operation. The minimum safe distance of 6 inches shall be measured from the exterior point of contact of the machine hazard closest to the employee. Once it has been determined the machine needs repair, the authorized employee will need to continue lockout and cannot remain under "troubleshooting" instructions.

*Id.*

---

is presumably affiliated with Allegis Group.
[3] An auger system transports dust from the air to a centralized location where it is loaded into containers and shipped out of Waupaca.

Waupaca's handbook also contains a section regarding disciplinary action. Under 4.1, it states, "[a]ny Employee that violates any of the Lockout rules and requirements will be disciplined up to, and including termination of employment. Termination may occur on the first offense." *Id.* It goes on in 4.1.1 to advise that, "[d]isciplinary actions are a day without pay, and a formal written reprimand in the employee's personnel file, or termination of employment." *Id.* This section further advises that "t]hese disciplinary actions may fall into any order depending on the seriousness of the incident." *Id.*

As part of his Employee Safety Orientation, Mr. Roper completed and passed an "Energy Control and Lockout Quiz" and a "New Employee Orientation Post-Quiz." (Ex. 4.) The Employee Safety Orientation form states the following:

> During production and/or Maintenance, anytime a machine guard, such as a physical guard, a machine door or panel, or a device like a light curtain or safety guard will be opened, removed or bypassed, and/or your body is placed in a pinch point or danger zone <u>Machine shut down and lockout is required</u>. Machine lockout prevents injury and damage to the machine.

*Id.* (Emphasis in original.) A true/false statement on this form states, "[m]achine lockout is required when a guard is removed." *Id.* Mr. Roper circled, "True." *Id.* On the Energy Control and Lockout Quiz, Question 1 states, "[a]ny type of work that places you in any location or position where you may be exposed to live or stored energy needed to be ____." *Id.* Mr. Roper wrote, "locked out." *Id.* On Question 8, it asks, "[w]ho is the only department that is authorized to open a machine door while the machine is running?" *Id.* Mr. Roper wrote, "maintenance." *Id.* The follow-up question asks, "[h]ow close can they get to the opening they have created during this process?" *Id.* Mr. Roper's response was six inches. *Id.*

By March 3, Mr. Roper completed and passed a lock-out audit resulting in his classification as an "authorized employee." (Ex. 5.) As an authorized employee, Mr. Roper could perform lock-out/tag-out alone. Waupaca held monthly safety meetings as well as special safety briefings, and Mr. Roper was part of an annual refresher on lock-out/tag-out in May.

Mr. Roper testified regarding his routine that he performed one to two times each day at Waupaca. After the "transferring of the shift" when he would meet with the second-shift maintenance co-worker to receive a verbal report about machinery, Mr. Roper performed a "walk-thru" on the auger catwalks to perform a visual inspection of the machinery to ensure the functionality of all transportation systems. Due to the poor air quality, Mr. Roper stated a visual inspection was necessary in order to see any holes that might be present due to rusting. He did not lock-out/tag-out the machinery prior to doing his daily walk-thru. Mr. Roper's undisputed testimony was that his immediate

3

supervisor, Chuck Henley, trained him to leave the machinery on when doing his daily walk-thru. It was also Mr. Roper's undisputed testimony that Mr. Henley and a second-shift co-worker trained him to grease bearings down in the trough system while it was still running.

Mr. Roper testified regarding the events that occurred on August 11. As required by Waupaca, Mr. Roper was wearing long-sleeved, fire resistant clothing (FRC), gloves, a hard hat, and safety glasses. After reporting to the sand lab to receive a verbal report from "Jose," a second-shift employee, Mr. Roper and Jose left the sand lab together. They saw a small plume of dark smoke upon the auger deck, which is located up two flights of stairs. Mr. Roper stated it was unusual to see smoke in that location. He walked on the mesh catwalk, which has eighteen to twenty-four inches on either side of the trough system. Mr. Roper looked on the auger deck to see if the auger "had seized" and if there was "an auger jumping out of the trough." (Ex. 9.) When he did not see those problems, Mr. Roper gave a "thumbs up" to Jose, who was on the ground floor, letting him know he would handle the situation.

Mr. Roper then went back across the auger deck to centralize the problem to know which row on the auger deck to shut down. He stated he wanted to make sure there were no holes in the auger system that needed repair. He walked around the end of the auger bit and saw that the auger door was open. (Ex. 7.) Mr. Roper also saw material coming out of the auger, but he did not perform any type of work or maintenance. As Mr. Roper stepped up on the trough system to go back to the sand lab to report his findings to the shift leader, he stated that, "something grabbed him" and started pulling his left arm into the auger bit. There were no witnesses to the accident. Mr. Roper had to pull his arm free in order to save his life. In doing so, the auger amputated his left hand right above his wrist. Despite the amputation of his hand, Mr. Roper compressed the arteries to control the bleeding and ran down two flights of stairs and forty yards across the auger deck until he ran into a co-worker who applied a tourniquet.

A helicopter flew Mr. Roper to UT Medical Center where he had numerous surgeries resulting in additional amputation of his left arm. (Ex. 2.) The hospital discharged him on August 26 with an infection and sent him home with medication to last for five days.[4]

During his hospitalization, Allegis denied Mr. Roper's claim on August 19 listing "safety violation" as the basis for its denial. (Ex. 11.) After Allegis denied his claim, Mr. Roper agreed to provide a recorded statement on September 2. Allegis introduced the recorded statement into evidence for the limited purpose of impeachment. (Ex. 13.) Three days after giving his record statement, UT Medical Center re-admitted Mr. Roper

---

[4] After August 31, the fifth day after his discharge, Mr. Roper no longer had any pain medication. He testified the only times he received additional pain medication was during his subsequent hospitalizations.

from September 5 through September 16 due to a worsening of his sepsis infection that had caused him to experience severe pain, difficulty breathing, and a fever for the prior three days. (Ex. 2.) Mr. Roper underwent additional surgery, and his left arm was amputated just below his shoulder. He received a PICC line to treat his infection.

After his second discharge from UT Medical Center, Mr. Roper's sepsis infection required him to travel approximately sixty-five to seventy miles one-way from Ten Mile, where he resides, to UT Medical Center in Knoxville, for thirty-three to thirty-six consecutive days to receive antibiotic treatments. Mr. Roper's last hospitalization due to his infection was from November 3 to November 7 during which time he underwent additional amputation of his left arm. Since his third hospitalization, Mr. Roper underwent an MRI and had a December 14 appointment scheduled to discuss the results. Further, David Erpenbach, P.A.-C, provided correspondence stating Mr. Roper was off work from August 11, 2016, forward until further notice.

Rebecca Williams, Regional Safety Manager for Allegis, also testified regarding her investigation of Mr. Roper's accident.[5] Ms. Williams does not work on-site at Waupaca. In fact, her only visit to Waupaca occurred on August 15 or 16. Brad Moses, Health and Safety Manager for Waupaca, and another individual employed by Waupaca, took Ms. Williams to the auger where Mr. Roper was injured. Ms. Williams stated that the only person she spoke with regarding Mr. Roper's accident was Mr. Moses. Due to Mr. Roper's hospitalization, Ms. Williams did not meet with him. Instead, the third-party administrator for Allegis advised her that it would obtain a statement from him.

While there, Ms. Williams took the photographs admitted into evidence as Exhibits 6 through 9. Ms. Williams walked on the auger catwalk while the machine was running. However, she stated she did not know if she walked the same route that Mr. Roper did when he was injured. Ms. Williams agreed with Mr. Roper's estimate that parts of the catwalk consist of tight spaces of eighteen to twenty-four inches. She also agreed with Mr. Roper's assessment that it is a tight fit at the end of the trough, and it is hard to stay six inches away from it. When asked how close she got to the auger, Ms. Williams stated she was standing up against the auger at one point while it was running and had dirt on her legs from leaning up against it.

Ms. Williams testified regarding Waupaca's disciplinary actions. She stated that if a "contractor," meaning a temporary employee like Mr. Roper, violated Waupaca's lockout/tag-out rules, Waupaca would give the person time off and investigate. Ms. Williams stated the contractor would likely not be allowed to return to Waupaca. Although Ms. Williams stated she knew that Waupaca had let go employees for violating

---

[5] Ms. Williams has worked for Allegis for over nine years. In her current position, she stated she partners with clients and employees to ensure that federal and state regulatory affairs are in order. Ms. Williams is an authorized OSHA instructor for maritime and general industry. Prior to working at Allegis, Ms. Williams worked over eighteen years in distribution and industrial/commercial environments.

safety rules, she stated she had no idea of how Waupaca exercises its policies beyond what Mr. Moses told her. Ms. Williams acknowledged she did not ask about nor was she aware of Mr. Roper's past safety record at Waupaca. However, Ms. Williams' opinion is that Mr. Roper violated a safety procedure because he accessed a panel that was open without performing lockout/tag-out. She acknowledged it was possible that the unit could have caught a thread and pulled his hand into it. Ms. Williams also stated she did not know if Mr. Roper was terminated. She stated that, from her standpoint, Mr. Roper was still "on the books" until he is released from his medical provider.

Likewise, Mr. Roper testified that no one has told him he is either suspended or terminated from working at Waupaca. He believes he did not violate any safety rule. Mr. Roper stated he did not receive any reprimands or warnings while working at Waupaca. He was adamant that he did not do anything differently in his daily routine on August 11. The accident occurred at the beginning of his shift, and he was not in a hurry or trying to save time. Mr. Roper testified he had seen other co-workers walking on the catwalk when it was not locked-out/tagged out. He was unaware of those employees receiving any reprimands from Waupaca.

### Findings of Fact and Conclusions of Law

The Court now turns to the legal principles it must apply to determine whether Allegis satisfied its burden of proof to establish the willful failure or refusal to use a safety device affirmative defense. Allegis need not prove every element of its defense by a preponderance of the evidence in order to succeed at an Expedited Hearing. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Instead, it must come forward with sufficient evidence from which this Court might determine it is likely to prevail at a hearing on the merits. *Id.*; Tenn. Code Ann. § 50-6-239(d)(1) (2016).

### *Willful Failure or Refusal to Use a Safety Device Affirmative Defense*

The controlling case outlining the willful misconduct affirmative defense is *Mitchell v. Fayetteville Public Utilities*, 368 S.W.3d 442 (Tenn. 2012); *see also Gonzales v. ABC Prof'l Tree Servs.*, No. 2014-06-0015, TN Wrk. Comp. App. Bd. LEXIS 2 (Tenn. Workers' Comp. App. Bd. Nov. 10, 2014). The previous statutory preference for an equitable construction and a remedial application played no role in *Mitchell's* outcome. Therefore, this Court is bound by its principles. *See McCord, supra,* at n.4 ("Reliance on precedent from the Tennessee Supreme Court is appropriate unless it is evident that the Supreme Court's decision or rationale relied on a remedial interpretation of pre-July 1, 2014 statutes[.]").

In order to successfully defend a workers' compensation claim on the basis of willful misconduct, willful disobedience of safety rules, or willful failure to use a safety

6

device under Tennessee Code Annotated section 50-6-110(a), the *Mitchell* Court adopted a four-step test: (1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide enforcement of the rule; and, (4) the employee's lack of a valid excuse for violating the rule. *Mitchell,* 368 S.W. at 453. In applying the four elements to the present case, this Court concludes that Allegis failed to meet its statutory burden to prove the defense of willful failure or refusal to use a safety device.

Before applying the *Mitchell* test to the facts of this case, the Court notes it observed Mr. Roper in an in-person, evidentiary hearing and finds him to be a credible witness. The Court gives no weight to the recorded statement admitted for the purposes of impeaching Mr. Roper's testimony. After sustaining a traumatic amputation of his hand and subsequent surgical amputations, UT Medical Center discharged Mr. Roper on August 26 with five days of medication. Seven days after his discharge and two days after he ran out of medication, Mr. Roper provided a recorded statement to Allegis. Three days later, UT Medical Center re-admitted Mr. Roper with severe pain, difficulty breathing, and a fever for the prior three days. Although the recorded statement shows discrepancies regarding two issues that are not relevant, the Court gives no weight to a recorded statement given under the circumstances that existed at that time. Thus, the Court holds that Allegis did not impeach Mr. Roper's testimony.

### 1. The employee's actual, as opposed to constructive, notice of the rule.

It is undisputed that Mr. Roper had actual, as opposed to constructive, notice of Waupaca's lockout/tag-out safety rules. He agreed he received safety training and took quizzes based on Waupaca's Energy Control and Lockout Compliance Work Instruction during his employee orientation. Mr. Roper's testimony was that he had a clear understanding of the lockout/tag-out rules. Therefore, Allegis satisfied the first element of the *Mitchell* test.

### 2. The employee's understanding of the danger involved in violating the rule.

It is undisputed that Mr. Roper understood the danger involved in violating the lockout/tag out safety rules. Mr. Roper specifically testified that the purpose of performing lockout/tag out was to avoid injuries during maintenance of the machinery. The training material that Mr. Roper received from Waupaca also discussed the reason behind the lockout/tag-out rules. Therefore, Allegis satisfied the second element of the *Mitchell* test.

7

### 3. The employer's bona fide enforcement of the rule.

As to the third element, Allegis failed to establish Waupaca's bona fide enforcement of the lockout/tag-out rules. Although the proof demonstrates that Waupaca provided its handbook to new employees and tested them during a new hire training orientation, the proof does not establish that Waupaca enforced and/or uniformly applied the rules. Mr. Roper's undisputed testimony is that he performed a walk-thru on the catwalks once or twice every day with the machines running as his supervisor, Chuck Henley, trained him to do. He saw other co-workers walking on the catwalks with the machines running on numerous occasions. Mr. Roper's unrebutted testimony was that Mr. Henley and a second-shift co-worker trained him to grease bearings down in the trough system while it was still running.

Additionally, to inspect and photograph the auger where Mr. Roper was injured, Ms. Williams testified she walked on the catwalks with the machinery running. In violation of the six-inch rule, Ms. Williams testified that at one point she was standing up against the auger while it was running and had dirt on her legs from leaning up against it. Although Ms. Williams is not working as a temporary employee at Waupaca like Mr. Roper, her testimony demonstrates a laxity by Waupaca on its bona fide enforcement of its lockout/tag-out rules.

Finally, either Waupaca believed Mr. Roper did not violate any safety rules or, if it did, it chose not to discipline him as required by its own rules. Waupaca's Energy Control and Lockout Compliance Work Instruction rules indicate that, at a minimum, a violator of the lockout/tag-out rules would receive "a day without pay, and a formal written reprimand in the employee's personnel file, or termination of employment." (Ex. 3.) Here, Mr. Roper never received a reprimand or termination from Waupaca. Ms. Williams is also unaware of Mr. Roper receiving any reprimand or termination from Waupaca. Therefore, Allegis did not satisfy the third element of the *Mitchell* test.

### 4. The employee's lack of a valid excuse for violating the rule.

As to the fourth element, the Court finds based upon the proof that Mr. Roper did not violate a safety rule. However, in the alternative, if Mr. Roper violated the six-inch rule, the reasonable excuse for violating the rule is that both Mr. Roper and Ms. Williams testified that the area where Mr. Roper was injured is a tight space on the catwalk. Ms. Williams also testified it is hard to stay six inches away from the trough and the end of it where Mr. Roper was injured. Waupaca's Energy Control and Lockout Compliance Work Instruction rule 8.1.2 permits authorized maintenance workers, like Mr. Roper, to perform troubleshooting in order to determine if a machine needs repair before instituting the lockout/tag-out procedure. If Mr. Roper violated the six-inch rule, the testimony of Mr. Roper and Ms. Williams indicate that any such violation was unavoidable as opposed to a willful violation.

8

Allegis also argued that Mr. Roper violated Waupaca's rule about performing lockout/tag-out anytime a machine door or panel "will be opened, removed or bypassed and/or if your body is placed in a pinch point or danger zone." (Ex. 4.) Mr. Roper testified he did not open the auger door but saw that it was open when he performed his walk-thru to locate the cause of the plume of smoke. He testified he did not perform any work on the auger. Instead, prior to the accident, Mr. Roper intended to return to the ground level to initiate the lockout/tag-out procedure prior to working on the auger. Therefore, for the reasons set forth above, Allegis did not satisfy the fourth element of the *Mitchell* test.

Accordingly, the Court holds Allegis is unlikely to prevail at a hearing on the merits in proving that Mr. Roper's claim is barred by the safety rule defense. The Court further holds Mr. Roper is likely to prevail at a hearing on the merits in proving his August 11 claim is compensable under the Workers' Compensation Law. Therefore, since the only disputed issue was whether Mr. Roper's claim was barred by the safety rule defense, the Court grants his request for medical and temporary disability benefits without any legal analysis as to those issues.

**IT IS, THEREFORE, ORDERED** as follows:

1. Allegis or its workers' compensation carrier shall, at Mr. Roper's discretion, either authorize him to continue treating at UT Medical Center or provide him with a panel of appropriate specialists compliant with Tennessee Code Annotated section 50-6-204(a)(3) (2016) for treatment of his August 11, 2016 injury. Mr. Roper or the providers shall furnish Allegis, or its carrier, bills for the charges incurred for compensable care, and Allegis or its carrier shall timely pay said charges.

2. Upon presentment of bills by Mr. Roper or his treating providers, Allegis or its carrier shall timely pay the charges for past treatment of Mr. Roper's work-related injuries by, or upon the prescription of, UT Medical Center.

3. Allegis shall also pay the appropriate amount of mileage reimbursement to Mr. Roper for the numerous trips he made from his residence in Ten Mile to UT Medical Center in Knoxville.

4. The parties stipulated Mr. Roper's average weekly wage is $1,033.32, which equates to a weekly compensation rate of $689.22.

5. Payment of past due temporary disability benefits in the amount of $13,193.64 shall be made for the period from August 11, 2016, to December 23, 2016.

6. Allegis or its workers' compensation carrier shall continue to pay temporary disability benefits in regular intervals to Mr. Roper until he is no longer eligible

9

for those benefits by reaching maximum medical improvement, by returning to work at a wage equal to or greater than the pre-injury wage, or by a release without restrictions by the authorized treating physician. Allegis' representative shall immediately notify the Bureau, Mr. Roper, and Attorney Jeff Rufolo, of the intent to terminate temporary disability benefits by filing Form C-26, citing the basis for the termination.

7. Pursuant to Tennessee Code Annotated section 50-6-226(d)(1)(B) (2016), the Court awards reasonable attorney fees and reasonable costs incurred by Attorney Jeffrey Rufolo. Mr. Rufolo requested attorney fees under said provision in his pre-hearing brief and verbally moved the Court to award such fees in his closing. Before Allegis or its workers' compensation carrier is required to pay said attorney fees, Mr. Rufolo shall file a supporting affidavit of his billable time and, if any, expenses incurred, with the Clerk.

8. This matter is set for a Scheduling Hearing on March 14, 2017, at 10:00 a.m. Eastern Time.

9. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

10. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

IT IS SO ORDERED.

**ENTERED this the 23rd day of December, 2016.**

_Audrey Headrick_
**Judge Audrey A. Headrick**
**Court of Workers' Compensation Claims**

Scheduling Hearing:

A Scheduling Hearing has been set on March 14, 2017, at 10:00 a.m. Eastern Time, with **Judge Audrey A. Headrick, Court of Workers' Compensation Claims. You must call 423-634-0164 or toll free at 855-383-0001 to participate in the Hearing.**

**Please Note: <u>You must call in on the scheduled date/time to participate.</u> Failure to call in may result in a determination of the issues without your further participation.**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven business days* of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited

11

Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

# APPENDIX

Exhibits:

1. Affidavit of Jeremiah Roper
2. Medical records of UT Hospital
3. Energy Control and Lockout Compliance Work Instruction
4. Employee Safety Orientation; Energy Control and Lockout Quiz; and New Employee Orientation: E/H/S Post-Quiz
5. Authorized Employee Lockout Audit; Training/Payroll Attendance Sheet; Three photographs of open hatch with warning
6. Photo (Top view of hatch with red handle)
7. Photo (Side view of auger)
8. Photo (angle view of door)
9. Photo (long view of auger)
10. First Report
11. Notice of Denial
12. Three photographs of open hatch with warning
13. Recorded Statement


Technical record:

1. Petition for Benefit Determination, filed September 8, 2016
2. Amended Petition for Benefit Determination, filed September 23, 2016
3. Dispute Certification Notice, filed October 18, 2016
4. Request for Expedited Hearing, filed October 25, 2016
5. Medical Record Table of Contents, filed October 26, 2016
6. Supplemental Medical Record Table of Contents, filed November 7, 2016
7. Notice of Expedited Hearing, filed November 22, 2016
8. Joint Motion for Extension of Filing Time Periods, filed December 2, 2016
9. Order Granting Joint Motion for Extension of Filing Time Periods, entered December 5, 2016
10. Employee's Pre-Hearing Brief, filed December 5, 2016
11. Expedited Hearing Brief of Employer and Insurance Carrier, filed December 7, 2016
12. Motion to Amend Pleadings, filed December 7, 2016
13. Order Granting Motion to Amend Pleadings, entered December 20, 2016

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order Granting Medical and Temporary Disability Benefits was sent to the following recipients by the following methods of service on this the 23rd day of December, 2016.

| Name | Certified Mail | Via Email | Email Address |
|---|---|---|---|
| Jeff Rufolo, Attorney | | X | jrufolo@summersfirm.com<br>jahollis@summersfirm.com |
| David Deming, Attorney | | X | ddeming@manierherod.com<br>tjoiner@manierherod.com |

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**